# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

DEREK QUINN,                              )
                                         )
      Plaintiff,                        )
                                         )
v.                                       )     CIVIL ACTION 13-0115-WS-C
                                         )
DEUTSCHE BANK NATIONAL                    )
TRUST COMPANY, *et al.*,                  )
                                         )
      Defendants.                       )

## ORDER

This matter comes before the Court on Deutsche Bank National Trust Company and Ocwen Loan Servicing LLC's Motion for Summary Judgment (doc. 42), Saxon Mortgage Services, Inc.'s Motion for Summary Judgment (doc. 44), and plaintiff Derek Quinn's Motion for Leave to Amend the Pleadings (doc. 61). All three motions are now ripe for disposition.[1]

---

[1]      Plaintiff, Derek Quinn, is currently proceeding *pro se*, his former attorney of record having been allowed to withdraw pursuant to a hearing conducted by Magistrate Judge Cassady on January 16, 2014. The traditional caveats as to deferential treatment of *pro se* litigants are therefore in play. *See Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."). Nonetheless, the application of those principles is attenuated here for two reasons. First, Quinn was represented by counsel of his choice from the inception of this lawsuit until after the filing of defendants' Rule 56 motions. Second, record facts show that Quinn graduated from the Birmingham School of Law in 2000, passed the Alabama Bar Examination in 2001, and practiced civil and criminal law as a solo practitioner until October 2005. (Quinn Dep., at 10-11.) Because Quinn is formally trained in the law and has experience in federal court, the deference to which he would otherwise be entitled is reduced. *See, e.g., Olivares v. Martin*, 555 F.2d 1192, 1194 n.1 (5th Cir. 1977) ("Mr. Olivares proceeds *pro se* in his appeal. We cannot accord him the advantage of the liberal construction of his complaint normally given *pro se* litigants … because he is a licensed attorney.") (citation omitted); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2nd Cir. 2001) ("*pro se* attorneys such as Holtz typically cannot claim the special consideration which the courts customarily grant to *pro se* parties"); *Thomas v. Humfield*, 1994 WL 442484, *3 (5th Cir. Aug. 2, 1994) ("With his formal legal training, Thomas should be expected to understand and to observe court procedures that we might otherwise be willing to excuse if neglected by typical *pro se* claimants."); *Godlove*
(Continued)

## I.    Relevant Factual and Procedural Background.

### A.    Record Facts.[2]

On February 28, 2007, plaintiff, Derek Quinn, and his wife (nonparty Theresa Quinn) refinanced a mortgage loan for their primary residence, a home on Shannon Lane in Semmes, Alabama.  (Anderson Decl. (doc. 45), ¶ 7; Quinn Dep. (doc. 43-1), at 15.)  Loan documents reflect that Quinn borrowed $114,750.00 from Novastar Mortgage, Inc., and executed an adjustable rate, 30-year note at an initial interest rate of 10.35%.  (Anderson Decl., ¶ 7 & Exhs. A-B.)  On October 26, 2007, defendant Saxon Mortgage Services, Inc. ("Saxon") acquired mortgage servicing rights to the loan.  (*Id.*, ¶ 8.)  On that date, Saxon notified Quinn that it had acquired the servicing of his loan, and that all payments on or after November 1, 2007 should be sent to Saxon at the address provided.  (*Id.*, ¶ 8 & Exh. C.)  The October 26 letter specified that "the assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments other than terms directly related to the servicing of your loan."  (*Id.*, Exh. C at 2.)

Less than a year after Saxon became servicer of his loan, Quinn fell behind on required payments.  (Anderson Decl., ¶ 9.)  From October 2008 through January 2009, Saxon mailed written notices of default and demands for payment to Quinn on a monthly basis.  (*Id.*, ¶¶ 9-10 &

---

*v. Bamberger, Foreman, Oswald, and Hahn*, 903 F.2d 1145, 1148 (7th Cir. 1990) ("Ordinarily, we treat the efforts of *pro se* applicants gently, but a *pro se* lawyer is entitled to no special consideration.").

[2]    Court are generally obliged under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiff's evidence (had he presented any) would be taken as true and all justifiable inferences would be drawn in his favor.  Here, however, plaintiff has not responded to defendants' Motions for Summary Judgment.  Under the Federal Rules of Civil Procedure, when a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Rule 56(e)(2)-(3), Fed.R.Civ.P.  Thus, the Court's inquiry with respect to record facts is not whether plaintiff might have disputed facts alleged by defendants on summary judgment, but whether "the motion itself is supported by evidentiary materials."  *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).

Exhs. D-E.) On April 15, 2009, Quinn entered into an agreement with Saxon styled "Formal Repayment Plan" (the "Repayment Plan"). (*Id.*, ¶ 11 & Exh. F.) In this agreement, Quinn expressly "acknowledge[d] that the Note is in default as of this date and Mortgagor is unable to pay the defaulted amount of $7,479.51 … to bring the note current." (*Id.*, Exh. F.) In consideration for the lender's forbearance from exercising foreclosure and other contractual remedies, Quinn promised to make a $4,000 lump sum payment to Saxon by April 30, 2009, followed by eight monthly payments of $1,251.41 due by the end of each month, to get the loan current, before resuming regularly scheduled monthly payments in January 2010. (*Id.*)[3]

At first, Quinn honored his obligations under the Repayment Plan. Indeed, he made the $4,000 downpayment in April 2009, as well as the required repayment installments for the months of May, June, July and August 2009 (albeit the last one was not received by Saxon until September 2, 2009). (Anderson Decl., ¶¶ 15-19.) But Quinn failed to make the $1,251 installment repayment due by September 30, 2009. (*Id.*, ¶ 20.)[4] Quinn spoke with a Saxon representative on October 7, 2009 and advised that he would make the payment that day; however, Saxon received no payment from Quinn that day, or in the ensuing days. (*Id.*, ¶¶ 20-23 & Exh. G, at 2.) As of October 15, 2009, Quinn still had not made the September 30, 2009 payment under the Repayment Plan, nor had he provided adequate assurances that payment was imminent. (*Id.*, ¶ 23.) So Saxon sent him a letter that day, stating as follows: "This letter is formal notice to you that you are in default under the terms of the documents creating and securing your Loan." (*Id.*, ¶ 23 & Exh. H.) The October 15 letter notified Quinn that "the Breach must be cured by the close of business on November 12, 2009 by sending a payment

---

[3]     The Repayment Plan also provided that (i) failure by Quinn to make timely payments "shall immediately result in this Agreement becoming null and void and shall permit Noteholder to immediately proceed with its remedies, without further notice, including foreclosure;" and (ii) Quinn acknowledged "that the Note and Security Instrument are valid and enforceable, and that all of the terms contained therein remain in full force and effect," and that "the forbearance provided herein shall be without prejudice to the Noteholder's right to exercise its power of sale or exercise any other rights and remedies under the Note and Security Instrument." (Anderson Decl., ¶ 11, Exh. F, at §§ 6, 9.)

[4]     This omission was documented in Saxon's internal records with an entry on September 30, 2009, bearing the notation, "promise plan 11 broken 09/30/09 promise DT 09/30/09." (Anderson Decl., Exh. G, at 3.)

made payable to Saxon Mortgage Services, Inc. in the sum of $6,267.82," failing which Saxon may accelerate the entire loan "without further demand and may invoke foreclosure proceedings, which will result in your loss of the Property." (*Id.*)

During the next several weeks, Quinn had multiple telephonic communications with Saxon representatives. In those calls, Saxon repeatedly advised Quinn that the Repayment Plan had been canceled because of his breach and Quinn repeatedly promised to send specific sums of money to Saxon by specific dates, then failed to follow through. (Anderson Decl., ¶¶ 25-32.) Despite his promises to the contrary, Quinn's only transfer to Saxon between October 15, 2009 and November 29, 2009 was a $575 payment (applied to the amount due for August 2009 under the original loan documents) on October 19. (*Id.*) On November 30, 2009, Quinn made a payment of $1,188.40 to Saxon to cover the amount originally due for September 2009. (*Id.*, ¶ 33.) That was the last payment Saxon ever received from Quinn. (*Id.*, ¶ 34.) Despite Quinn's noncompliance with the Repayment Plan and the defaulted status of his loan (as evidenced by the October 15 letter), Saxon applied all payments that Quinn did make to the loan, and transmitted to Quinn a written payment history in May 2010 at his request to document same. (*Id.*, ¶¶ 35, 37 & Exh. J.)

On November 16, 2009, Saxon sent a letter to Quinn at his residence address in Semmes, Alabama to advise him that, "[e]ffective on December 1, 2009, the servicing of your mortgage loan will be transferred from Saxon to OCWEN LOAN SERVICING, LLC." (*Id.*, ¶ 30 & Exh. I.) The November 16 letter instructed Quinn that Saxon would no longer accept payments on his loan after November 30, 2009, and that all payments due on or after December 1, 2009 should be sent to Ocwen at the address provided. (*Id.*)[5] Saxon never serviced Quinn's loan after December 1, 2009, and never foreclosed on Quinn's home. (*Id.*, ¶ 36.)

By the time Ocwen became the servicer of Quinn's loan on December 1, 2009, his payments were already delinquent and his loan was already in default, as described *supra*.

---

[5]      Defendant Ocwen is the loan servicer for defendant Deutsche Bank as Trustee for the Registered Holders of Novastar Mortgage Funding Trust, Series 2007-2 Novastar Home Equity Loan Asset Backed Certificates, Series 2007-2. (Ortwerth Aff. (doc. 43-3), ¶¶ 2-3.) Accordingly, Quinn's claims in this litigation against Ocwen and Deutsche Bank are factually intertwined, inasmuch as Ocwen's acts and omissions in servicing his loan were taken in its capacity as loan servicer for Deutsche Bank.

(Ortwerth Aff. (doc. 43-3), ¶ 6.)  In telephonic contacts with Ocwen in early 2010, Quinn insisted that payment on his loan was current and blamed Saxon for the loan documentation and records showing otherwise.  (Doc. 43-3, at 43-44.)  Be that as it may, Ocwen received no funds from Quinn until February 11, 2010, when he submitted two payments, one in the amount of $1,088.00 and the other in the amount of $1,088.01.  (Ortwrth Aff., ¶ 7; doc. 43-3, at 43.)  Even after crediting those funds, Ocwen's records showed that Quinn's account had a past-due amount of $6,320.82, plus a currently due amount of $1,117.23, for a total amount owed of $7,438.05.  (Doc. 43-3, at 43.)  In the following weeks, Quinn made no further payments on the loan, and multiple certified mailings from Ocwen to Quinn were returned as "unclaimed."  Ultimately, Ocwen initiated foreclosure on March 21, 2010.  (*Id.* at 41-43.)  On April 12, 2010, Quinn attempted to make a monthly installment payment to Ocwen in the amount of $1,160.00; however, Ocwen refused to accept it because the loan was in default and the proffered funds were insufficient to bring Quinn's account current.  (Ortwerth Aff., ¶ 7 & Exh. A; doc. 43-3, at 41.)  Quinn never became current on his loan payments to Ocwen.  (Ortwerth Aff., ¶ 8.)

After more than two years of failed negotiations and communications between Quinn and Ocwen, the parties proved unwilling or unable to resolve their dispute.  When Ocwen announced plans to proceed with a foreclosure sale on Quinn's home on August 30, 2012, Quinn commenced this lawsuit in an effort to halt the foreclosure sale and obtain damages.  The foreclosure sale was averted, at least temporarily; however, the underlying dispute remains ongoing.

### B.    *Procedural History.*

On or about August 28, 2012, Quinn (by and through retained counsel of his choosing) filed a Complaint against Deutsche Bank National Trust Company, Novastar Mortgage Funding Trust, Series 2007-2, Ocwen Loan Servicing, LLC, and Saxon Mortgage Services, Inc. in the Circuit Court of Mobile County, Alabama.  The Complaint interposed the following state-law causes of action: (i) a claim for declaratory relief (requesting a declaration that Quinn "was never in default on his mortgage payments to Defendants, or, in the alternative, that any default by Plaintiff was caused by Defendants' error") (Count One); (ii) a claim for injunctive relief (seeking to enjoin Deutsche Bank from selling the property on August 30, 2012) (Count Two); (iii) a claim for accounting (requesting that defendants provide a detailed accounting of Quinn's mortgage loan from the outset of their involvement in the mortgage) (Count Three); (iv) a claim

for negligence (alleging that defendants breached "a duty to accept and apply Plaintiff's mortgage payments toward principal and interest on Plaintiff's loan") (Count Four); and (v) a claim for wantonness (alleging that defendants' negligent failure to accept and apply Quinn's mortgage payments was "carried out consciously and knowingly by the Defendants with reckless disregard for the consequences"). No other causes of action were asserted in the Complaint.

On March 8, 2013, defendant Saxon (with consent of the other defendants) filed a Notice of Removal (doc. 1) removing Quinn's suit to this District Court. Federal subject matter jurisdiction was predicated on, *inter alia*, diversity jurisdiction pursuant to 28 U.S.C. § 1332, insofar as Quinn is a citizen of Alabama, each named defendant is a citizen of a state or states other than Alabama for diversity purposes, and the amount in controversy exceeds the $75,000 jurisdictional limit because the appraised market value of Quinn's property (foreclosure of which is at issue in the suit) was $91,900. Plaintiff did not seek remand of this action to state court, and this case has been pending in this District Court for approximately one year.

On April 29, 2013, Magistrate Judge Cassady entered a Rule 16(b) Scheduling Order (doc. 10), providing, in relevant part, that "[m]otions for leave to amend the pleadings and to join other parties must be filed not later than **July 15, 2013**." (Doc. 10, ¶ 4.) That deadline passed without plaintiff seeking leave to amend the Complaint. At no time prior to the close of discovery in December 2013, or defendants' filing of their Motions for Summary Judgment in January 2014, did plaintiff ever request leave to amend his Complaint. On February 26, 2014, however, long after briefing had concluded on the Rule 56 Motions, Quinn filed a Motion to Amend the Pleadings (doc. 61), whereby he seeks to interpose brand-new causes of action against defendants on theories of breach of contract (Count Six), conversion (Count Seven), fraud / misrepresentation (Count Eight), and unfair dealing and deceptive trade practices (Count Nine). Defendant Saxon has filed a response (doc. 63) opposing this request on various grounds. Defendants Ocwen and Deutsche Bank have expressly joined in Saxon's opposition. (*See* doc. 65.) Plaintiff filed a reply (doc. 64) in support of his Motion to Amend on March 10, 2014.

On January 10, 2014, defendants Deutsche Bank and Ocwen jointly filed a Motion for Summary Judgment, and defendant Saxon filed a separate Motion for Summary Judgment.[6] The

---

[6]     Plaintiff's claims against defendant Novastar were previously dismissed on a stipulation of the parties. (*See* docs. 32, 33.) Moreover, while the Complaint references
(Continued)

Court fixed a briefing schedule for those Rule 56 Motions, pursuant to which plaintiff's responses were due by February 7, 2014. (*See* doc. 47.) Plaintiff did not file timely responses; rather, he requested an enlargement of time six days after the response deadline had passed. Via a pair of Orders (docs. 57, 60) dated February 17, 2014 and February 25, 2014, the Court carefully considered and denied Quinn's request for extension and request for reconsideration upon denial of extension.[7] As such, both Motions for Summary Judgment have been taken under submission on the present record, without briefing by plaintiff.

## II. Plaintiff's Motion to Amend Pleadings.

The threshold defect in plaintiff's Motion to Amend the Pleadings is that it was filed more than seven months after the deadline fixed in the Rule 16(b) Scheduling Order for such motions. The scheduling order deadline is neither aspirational nor advisory. In that regard, the Federal Rules of Civil Procedure provide that scheduling order deadlines "may be modified only for good cause and with the judge's consent." Rule 16(b)(4), Fed.R.Civ.P.[8] The "good cause"

---

"Fictitious Parties A through C," fictitious party pleading is generally improper in federal court. *See Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) ("As a general matter, fictitious-party pleading is not permitted in federal court."); *CSX Transportation, Inc. v. United Transp. Union*, 2007 WL 1643172, *1 n.1 (11th Cir. June 7, 2007) ("the Federal Rules do not authorize suit against fictitious parties"). Thus, Deutsche Bank, Ocwen and Saxon are the only remaining defendants in this action, and all three have moved for summary judgment.

[7]    The February 17 and 25 Orders denied Quinn's requests for relief from the briefing schedule, notwithstanding his newly *pro se* status, for the following reasons: (i) Quinn's motion for extension was predicated on a representation that he had been unaware of the existence of defendants' Rule 56 Motions until February 13, 2014 (after the response deadline had passed), but a January 16 hearing recording reveals that Judge Cassady repeatedly and pointedly referenced the pendency of those motions in remarks to Quinn; (ii) an Order entered by Judge Cassady prior to the briefing deadline had expressly reminded Quinn of that deadline, yet by his own admission Quinn did not read that Order for two weeks after he received it; (iii) Quinn (who had formerly been a lawyer and had practiced law for four years, including appearances in federal court) admittedly made no attempt to review the docket sheet to ascertain the pending motions and deadlines for nearly a month after Judge Cassady explained that Quinn was to proceed *pro se* unless or until he retained new counsel.

[8]    *See also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1312 (11th Cir. 2009) (where motion to amend came long after scheduling order deadline, "Plaintiffs were required to show good cause under Federal Rule of Civil Procedure 16(b)."); *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1241 (11th Cir. 2009) ("A plaintiff seeking leave to amend its complaint (Continued)

standard "precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension." *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (citation and internal quotation marks omitted); *see also Romero v. Drummond Co.*, 552 F.3d 1303, 1319 (11th Cir. 2008) ("To establish good cause, the party seeking the extension must have been diligent."). This rule is strictly enforced, particularly where, as here, nonmovants object to the proposed amendment as untimely under the applicable scheduling order.[9]

In an attempt to meet his burden under Rule 16(b)(4), Quinn places the blame squarely on his former attorney, who filed a motion to withdraw on January 6, 2014 (*see* doc. 40) that Judge Cassady granted at a hearing conducted on January 16, 2014. Specifically, Quinn maintains that he "was not in charge of his case when the original complaint was filed," that his attorney "refused to address all issues" that Quinn wanted in the Complaint, that "Quinn disagreed" with his lawyer, but that Quinn "was not allowed to perform any legal work on this case" until after his attorney withdrew from the representation in January 2014. (Doc. 61, ¶¶ 1-2.) Quinn further claims that his attorney "left [him] in the dark until late November 2013," and lambastes his former counsel's "mistakes and laziness." (Doc. 64, ¶¶ 3, 5.)

Such a showing falls well short of the requisite "good cause." As a general proposition, it is a cornerstone of our representative system of advocacy that a litigant is bound by all acts and omissions of his freely selected agent. *See, e.g., Link v. Wabash R. Co.*, 370 U.S. 626, 633-34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions

---

after the deadline designated in a scheduling order must demonstrate 'good cause' under Fed.R.Civ.P. 16(b).").

[9]     *See, e.g., Rogers v. Hartford Life and Acc. Ins. Co.*, 2012 WL 2395194, *1 n.3 (S.D. Ala. June 22, 2012) ("[A] scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril. … Disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier.") (citation omitted); *Will-Burn Recording & Pub. Co. v. Universal Music Group Records*, 2009 WL 1118944, *2 n.5 (S.D. Ala. Apr. 27, 2009) ("Particularly where a nonmovant objects to a proposed amendment as untimely under the applicable scheduling order, this Court has strictly applied the Rule 16(b) 'good cause' standard to belated amendments to the pleadings.").

of this freely selected agent.").[10]  Simply put, "[a] party cannot avoid the consequences of the acts or omissions of his voluntarily selected 'lawyer-agent.'"  *Shuler v. Ingram & Associates*, 2011 WL 4495624, *3 (11th Cir. Sept. 29, 2011) (citation omitted).  More specifically, federal courts resist litigants' efforts to derive "good cause" for Rule 16(b)(4) purposes from mere disagreement with the strategy decisions of prior counsel.  *See Scott v. New York City Dep't of Correction*, 2011 WL 5176580, *1 (2nd Cir. Nov. 2, 2011) (no abuse of discretion in lower court's conclusion "that the apparent negligence of Scott's former attorney was not sufficient to establish 'good cause' for amending the scheduling order").[11]

On this record, the Court readily concludes that Quinn has not established "good cause" under Rule 16(b)(4) to reopen the long-expired deadline for seeking leave to amend the pleadings.  Plaintiff's *pro se* status does not excuse his noncompliance with the rule.  *See* Local Rule 83.9(b) ("All litigants proceeding *pro se* shall be bound by and comply with all local rules of this Court, and the Federal Rules of Civil and Criminal Procedure, unless otherwise excused from operation of the rules by court order."); *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002) ("Despite construction leniency afforded *pro se* litigants, we nevertheless have required them to conform to procedural rules.").  Nor is it accurate for plaintiff to accuse this Court of believing "that Quinn is some super-law person who can transcend time and law and make things

---

[10]      *See also Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 864 (11th Cir. 2004) ("the Supreme Court has said that clients are to be held accountable for the acts and omissions of their attorneys"); *Barger v. City of Cartersville, Ga.*, 348 F.3d 1289, 1295 (11th Cir. 2003) ("the attorney's omission is no panacea" because a contrary ruling would be tantamount to "visiting the sins of plaintiff's lawyer upon the defendant") (citation omitted); *Shuler v. Ingram & Associates*, 2011 WL 4495624, *3 (11th Cir. Sept. 29, 2011) (plaintiffs' argument "that they should not be held responsible for their former attorneys' admissions in their opposition brief … is without merit because a litigant is generally bound by all acts and omissions of his attorney").

[11]      *See also Marlowe Patent Holdings LLC v. Dice Electronics, LLC*, 293 F.R.D. 688, 701 (D.N.J. 2013) ("*Ex post facto* disagreement with strategic decisions of counsel, made in the course of litigation, does not constitute good cause."); *Alexander v. Westbury Union Free School Dist.*, 829 F. Supp.2d 89, 118 (E.D.N.Y. 2011) ("To find good cause simply on the basis of new counsel would be to allow a party to manufacture good cause at any time simply by switching counsel.") (citations and internal quotation marks omitted); *Buchanan County, Virginia v. Blankenship*, 545 F. Supp.2d 553, 555 n.2 (W.D. Va. 2008) ("The defendants have recently obtained new counsel, but that alone is insufficient reason for ignoring the scheduling deadlines.").

happen out of thin air." (Doc. 64, at 4.) What is accurate is that Quinn is legally bound by the acts and omissions of his former attorney in this lawsuit. He cannot turn back the hands of time to restart this litigation anew – all to the undue prejudice of opposing parties and excessive delay in this litigation – simply because he disagrees with what his ex-lawyer did or did not do whilst Quinn's gaze was averted. Accordingly, the Motion for Leave to Amend the Pleadings (doc. 61) is **denied**.[12]

### III.    Defendants' Motions for Summary Judgment.

#### A.    *Summary Judgment Standard.*

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make

---

[12]    Even if Quinn had shown good cause for modification of the Scheduling Order, comporting with Rule 16(b)(4), the Court would still deny the Motion for Leave to Amend under the traditional Rule 15 analysis. *See Sosa,* 133 F.3d at 1419 (explaining that both Rule 16(b) and Rule 15(a) must be satisfied before a litigant will be allowed to amend its pleading after the scheduling order deadline). It is well-settled that, even under the lenient Rule 15 standard, leave to amend pleadings is properly denied where the amendment would cause undue prejudice for the opposing party. *See, e.g., Mann v. Palmer*, 713 F.3d 1306, 1316 (11th Cir. 2013) ("Although leave to amend shall be freely given when justice so requires, a motion to amend may be denied on numerous grounds such as … undue prejudice to the defendants") (citation omitted); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (district court need not allow amendment "where allowing amendment would cause undue prejudice to the opposing party") (citation omitted). The undue prejudice to defendants in this case would be clear. They conducted discovery and prepared summary judgment motions on the express understanding that Quinn was bringing a certain constellation of claims against them. For Quinn now to be allowed to expand those claims – after discovery has closed, after the summary judgment deadline has passed, and after defendants have gone to considerable effort and expense to litigate and brief the original set of claims – would plunge this case into turmoil. Through no fault of their own, defendants would be placed in the untenable position of having an imminent trial setting as to brand new causes of action that they have not been able to explore via discovery or attack via dispositive motion. This outcome would plainly work undue prejudice on defendants, justifying denial of the amendment even under liberal Rule 15(a) principles.

'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

As mentioned, Quinn did not file a response to defendants' Motions for Summary Judgment. Applicable law is clear that "[s]ummary judgment is not automatically granted by virtue of a non-movant's silence." *Williams v. Aircraft Workers Worldwide, Inc.*, 832 F. Supp.2d 1347, 1352 (S.D. Ala. 2011).[13] If a nonmovant fails to respond to a summary judgment motion, then the movant's assertions of facts supported by record evidence may be deemed "undisputed for purposes of the motion." Rule 56(e)(2), Fed.R.Civ.P. In that scenario, the court may "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Rule 56(e)(3). In performing that analysis, a court is not obligated to read minds and ordinarily will not construct arguments or theories that a party has failed to raise.[14] As such, Quinn's failure to proffer argument, evidence or authority

---

[13]      "Even in an unopposed motion [for summary judgment], … the movant is not absolve[d] … of the burden of showing that it is entitled to judgment as a matter of law." *Mann*, 588 F.3d at 1303 (citations and internal quotation marks omitted); *see also United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion … [and] ensure that the motion itself is supported by evidentiary materials."); Commentary to 2010 Amendments to Fed.R.Civ.P. 56(e) ("summary judgment cannot be granted by default even if there is a complete failure to respond to the motion").

[14]      *See, e.g., Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (noting that a litigant "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions") (citation omitted).

in response to defendants' Rule 56 Motions is at his peril. Such an omission imparts no burden on this Court to "fill in the blanks" in the legal analysis and briefing on his behalf.[15] Nor will the Court scour uncited portions of the record in search of evidence that might bolster plaintiff's position. *See, e.g.,* Rule 56(c)(3)("[t]he court need consider only the cited materials" on summary judgment); *King v. ST Aerospace Mobile, Inc.*, 2013 WL 2635926, *1 n.1 (S.D. Ala. June 11, 2013) ("This Court will not scour uncited portions of these exhibits in hopes of unearthing potentially helpful factual nuggets that the parties have not addressed.").

### B. *Plaintiff's Negligence/Wantonness Claims.*

In Counts Four and Five of the Complaint, Quinn alleges state-law claims of negligence and wantonness against all defendants. As articulated in the Complaint, Quinn's theory is that defendants were negligent in that they "had a duty to accept and apply Plaintiff's mortgage payments toward principal and interest on Plaintiff's loan," yet they breached that duty. (Complaint, ¶¶ 22-23.) Quinn's wantonness claim is similar, inasmuch as he alleges that these purported "negligent acts … were carried out consciously and knowingly by the Defendants with reckless disregard for the consequences." (*Id.*, ¶ 25.)[16] Thus, the crux of Counts Four and Five is Quinn's contention that defendants should have accepted, applied and credited his mortgage payments in a timely and accurate manner, and that their alleged failure to do so breached a duty of care owed to him and caused him to incur damages.

Under any reasonable reading of Counts Four and Five, Quinn seeks to hold defendants liable for negligently and/or wantonly servicing his mortgage loan. On summary judgment,

---

[15]      *See, e.g., Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. … Rather, the onus is upon the parties to formulate arguments ….") (citations omitted); *Godfrey v. Nationwide Vinyl Siding & Home Imp., LLC*, 912 F. Supp.2d 1320, 1330 (S.D. Ala. 2012) ("On summary judgment, the Court cannot 'fill in the blanks' to formulate a legal argument that a party has not."); *Minemyer v. B-Roc Representatives, Inc.*, 695 F. Supp.2d 797, 809 (N.D. Ill. 2009) ("[T]his is an adversarial system. It is not a court's task to research legal arguments on a party's behalf").

[16]      For both Count Four and Count Five, Quinn maintains that defendants' conduct damaged him by causing him to be accused of being in default on the loan, to face liability for additional fees and costs in the loan balance, to incur legal fees and other financial losses, to have his property placed in foreclosure proceedings, and to suffer "severe mental anguish and emotional distress." (*Id.*, ¶ 23.)

Saxon, Ocwen and Deutsche Bank correctly argue that these claims suffer from an insuperable legal defect. Specifically, numerous recent authorities have held that Alabama law does not recognize a cause of action for negligent or wanton servicing of a mortgage that results in economic damages. *See Wallace v. SunTrust Mortg., Inc.*, --- F. Supp.2d ----, 2013 WL 5422799, *9 (S.D. Ala. Sept. 26, 2013) ("Recent federal precedent interpreting Alabama law has uniformly found that no cause of action for negligent or wanton servicing of a mortgage account exists under Alabama law, at least in the absence of personal injury or property damage …."); *Selman v. CitiMortgage, Inc.*, 2013 WL 838193, *5 (S.D. Ala. Mar. 5, 2013) (same); *Webb v. Ocwen Loan Servicing, LLC*, 2012 WL 5906729, *7 (S.D. Ala. Nov. 26, 2012) ("under Alabama law a cause of action for negligent servicing of a mortgage against Ocwen cannot be maintained where the damages are economic"); *Deutsche Bank Trust Company Americas v. Garst*, 2013 WL 4851493, *9 (N.D. Ala. Sept. 11, 2013) (recognizing and joining "emerging consensus that Alabama law does not recognize a cause of action for negligent or wanton mortgage servicing," because claims related to performance under a mortgage agreement must be brought under contract law, damages for mortgage servicing are typically economic, and there is a "plethora of alternative avenues for relief in 'negligent mortgage servicing' cases") (citation and internal quotation marks omitted); *Costine v. BAC Home Loans*, 946 F. Supp.2d 1224, 1234 (N.D. Ala. 2013) ("The Court agrees with the Middle District of Alabama's recent assessment that Alabama law does not recognize a cause of action for negligent or wanton mortgage servicing.") (citations and internal quotation marks omitted); *Buckentin v. SunTrust Mortg. Corp.*, 928 F. Supp.2d 1273, 1290 (N.D. Ala. 2013) ("Any obligations Defendant owed to Plaintiffs arose from the mortgage agreement, not from the duty of reasonable care generally owed to members of the public. … Plaintiffs' negligence and wantonness claims are not actionable under Alabama law."); *Blake v. Bank of America, N.A.*, 845 F. Supp.2d 1206, 1210-11 (M.D. Ala. 2012) ("Alabama law does not recognize a cause of action for negligent or wanton mortgage servicing"). "These decisions soundly reject the availability of negligence or wantonness claims under Alabama law in circumstances similar to those before this Court, and emphasize that mortgage servicing obligations are a creature of contract, not of tort, and stem from the

underlying mortgage and promissory note executed by the parties, rather than a duty of reasonable care generally owed to the public." *Wallace*, 2013 WL 5422799 at *9.[17]

In short, Quinn's claims that defendants negligently or wantonly serviced his mortgage loan (resulting in payments not being accepted or properly applied to his account) are not viable under Alabama law. Defendants are entitled to summary judgment on these causes of action, and Counts Four and Five are **dismissed**.

### C. *Plaintiff's Other Claims for Relief.*

Defendants also move for summary judgment on the other causes of action asserted in Quinn's Complaint, including his claim for declaratory relief (Count One), his claim for injunctive relief (Count Two), and his demand for an accounting (Count Three). The Court will consider each of these claims in turn.

With respect to Count One, Quinn asks for a declaratory judgment "that Plaintiff was never in default on his mortgage payments to Defendants, or, in the alternative, that any default by Plaintiff was caused by Defendants' error and that Plaintiff is not financially liable to Defendants for any costs, penalties, or late fees resulting from said default." (Complaint, at 3.) Considerable summary judgment evidence supports defendants' position that no such declaratory judgment should be entered. As discussed in detail *supra*, defendants' record evidence shows that Quinn fell behind on his mortgage payments in 2008 and 2009, that Saxon offered and he accepted the Repayment Plan in April 2009 to get his loan account back on track, that Quinn

---

[17]     To be sure, this line of cases leaves open the possibility of a cognizable claim for negligent/wanton mortgage servicing in cases involving personal injury or property damage. Quinn alleges in his Complaint that he "suffered severe mental anguish and emotional distress" as a result of defendants' purported negligent or wanton servicing of his mortgage. (Doc. 1-1, at 13, ¶¶ 23, 26.) This allegation does not save Counts Four and Five by bringing "personal injury" damages into play. After all, Alabama law forbids "[d]amages for mental anguish … for negligence except when the plaintiff has suffered a physical injury as a result of the negligent conduct or was placed in an immediate risk of physical injury by that conduct." *Brown v. First Federal Bank*, 95 So.3d 803, 818 (Ala.Civ.App. 2012); *see also AALAR, Ltd., Inc. v. Francis*, 716 So.2d 1141, 1147 (Ala. 1998) (explaining that Alabama law "limits recovery for emotional injury to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct"). Quinn's allegations in his pleading do not satisfy this threshold, and he has identified no evidence in the summary judgment record that would do so; therefore, mental anguish damages are unavailable with respect to Counts Four and Five.

admitted to a default of nearly $7,500 in April 2009, that Quinn failed to satisfy his obligations under the Repayment Plan, that Saxon canceled the Repayment Plan for that reason, that Quinn promised Saxon representatives that he would make additional payments by specific dates but failed to follow through, that Saxon declared the loan to be in default in October 2009, that servicing of the loan was transferred to Ocwen in December 2009, and that Quinn did not cure the default in his subsequent dealings with Ocwen. These facts (on which defendants rely, which are supported by the record, and which the Court deems admitted for summary judgment purposes pursuant to Rule 56(e)(2), Fed.R.Civ.P., because plaintiff failed properly to address them) directly undermine Quinn's position that he "was never in default on his mortgage payments" or "that any default by Plaintiff was caused by Defendants' error." Accordingly, Quinn is not entitled to a declaratory judgment from this Court declaring that he was never in default or that any default was defendants' fault. Pursuant to Rule 56(e)(3), defendants' Motions for Summary Judgment are **granted** as to Count One.

In Count Two, the Complaint alleges that Deutsche Bank "intends to sell, and unless restrained will sell the Property on August 30, 2012," and that "[t]he proposed sale of the Property is wrongful and should be enjoined." (Complaint, ¶¶ 16-17.) No other injunctive relief is referenced or demanded in Count Two. Of course, August 30, 2012 came and went more than a year and a half ago; therefore, plaintiff's request to enjoin any foreclosure sale from occurring on that date is **moot**. Even if Count Two is read expansively to encompass an unasserted claim for permanent injunction barring defendants from foreclosing on Quinn's home, summary judgment would remain appropriate. Simply put, defendants' evidence (which is considered undisputed pursuant to Rule 56(e)(2)) establishes that any contemplated foreclosure of the residence is not "wrongful." The mortgage that Quinn executed on February 28, 2007 specifically provided that if he defaulted on the loan and failed to cure such default in a timely manner after notice, "Lender at its option … may invoke the power of sale." (Anderson Decl., Exh. A, at ¶ 22.) Defendants' evidence shows that happened here, inasmuch as Quinn defaulted on his loan obligations, was given notice and an opportunity to cure the default, and failed to cure the default in a timely manner. As such, defendants' invocation of the power of sale was not wrongful, but was expressly authorized by the underlying loan documents that Quinn signed. Defendants' Motions for Summary Judgment are **granted** as to Count Two, inasmuch as the

requested injunctive relief is moot and, even if it were not, is contrary to record facts deemed admitted for purposes of summary judgment.

Finally, defendants have moved for summary judgment on Count Three, which is a state-law claim styled "Demand for an Accounting." In that cause of action, Quinn demands that defendants "provide a detailed accounting of Plaintiff's mortgage loan" and also "provide an accounting showing what the current status of the loan would be if the Defendants had accepted all payments tendered by Plaintiff." (Complaint, at 4.) Under Alabama law, the remedy of an accounting is equitable, committed to the discretion of the court, and typically available only in narrow circumstances, none of which are present here. *See McDuffie v. Holland*, 690 So.2d 386, 390 (Ala.Civ.App. 1996) ("When the equitable jurisdiction of the trial court is invoked, the trial court has much discretion in determining whether to order an accounting."); *Farr v. Southern Supply Co.*, 44 So.2d 247, 248 (Ala. 1950) ("A party is entitled to an equitable accounting … where … there are circumstances of great complication, or difficulties in the way of adequate relief at law.") (citation and internal quotation marks omitted); *Dewberry v. Bank of Standing Rock*, 150 So. 463, 466 (Ala. 1933) ("The essentials of a bill for accounting may be generally stated, as that where the remedy at law is inadequate, the account is mutual and complicated; or the defendant is guilty of fraud or wrongdoing; or where discovery is needed; or where such accounting is incidental to some other relief.").

Through the benefit of discovery in this litigation (and, in Saxon's case, detailed payment information that Saxon sent to Quinn back in May 2010), Quinn has already received detailed accountings from defendants about his loan, including what payments were received and how defendants credited them. It would thus serve no equitable purpose to order defendants to provide "a detailed accounting of Plaintiff's mortgage loan" to Quinn at this time. Moreover, because Quinn was in default of the loan and his April 2010 payment was properly rejected by Ocwen as inadequate to cure the default, it would be a waste of everyone's time and resources to compel Ocwen to "provide an accounting showing what the current status of the loan would be" if Ocwen had accepted that payment. The Court will not indulge hypotheticals and counterfactual scenarios in doling out equitable relief. Quinn defaulted on his loan and has already received the information he seeks from defendants as to the accounting of his payments and loan balances. On these facts (which are deemed undisputed for summary judgment purposes pursuant to Rule 56(e)(2)), the Court will not exercise its discretion in equity to order a

redundant and/or meaningless accounting. Accordingly, the Motions for Summary Judgment are **granted** as to the request for accounting, and Count Three is **dismissed**.

## IV. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. Plaintiff's Motion for Leave to Amend the Pleadings (doc. 61) is **denied**;

2. Deutsche Bank National Trust Company and Ocwen Loan Servicing LLC's Motion for Summary Judgment (doc. 42) and Defendant Saxon Mortgage Services, Inc.'s Motion for Summary Judgment (doc. 44) are **granted**;

3. The Complaint is **dismissed with prejudice**, and a separate judgment will enter; and

4. In light of this ruling, plaintiff's Demand for Jury Trial (doc. 59) and Saxon's Motion to Strike (doc. 62) are **moot**.

DONE and ORDERED this 12th day of March, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE